IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 1 6 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| MICHAEL RICHARD TELLEZ | § | |
| and JENNIFER ANN TELLEZ, | § | |
| REBECA GARZA, RUBEN | § | |
| SANTILLANA and MINERVA | § | |
| SANTILLANA, GUILLERMO | § | |
| CONTRERAS and OLGA | § | |
| CONTRERAS, ELUTERIO | § | CIVIL ACTION NO. B-03-218 |
| MORALES and ROSA MORALES, | § | JURY |
| and NORA GARCIA | § | |
| | § | |
| VS. | § | |
| | § | |
| ALLSTATE TEXAS LLOYD'S, | § | |
| A LLOYD'S COMPANY | § | |

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO SEVER
AND TRANSFER VENUE

TO THE HONORABLE ANDREW S. HANEN, DISTRICT JUDGE:

Comes now all Plaintiffs in this action and by way of response to Defendant's

Motion to Sever and Transfer, (hereinafter "Defendant's Motion") would show the Court

as follows:

I.

SUMMARY OF ARGUMENT

As to Defendant's Motion to Transfer Venue:

1. Defendant's Motion is defective as a matter of law as it is not supported by any

proof whatsoever. It does not, therefore, merit consideration by this Court.

2. Plaintiffs' choice of forum is entitled to great weight and absent compelling

circumstances should not be disturbed. Such circumstances do not exist in this case.

1

3.  Defendant has failed to sustain its burden to show through competent evidence that this forum is so inconvenient that transfer is required by 28 U.S.C. Section 1404(a).

**As to Defendant's Motion to Sever:**

4.  All Plaintiffs assert the right to relief in respect to or arising out of the same transaction, occurrence or series of transactions or occurrences and are, therefore, properly joined under Rule 20(a), F.R.C.P.

5.  Defendant's accusation against Plaintiffs' counsel of "impermissible forum shopping" is unsupported by any evidence whatsoever and constitutes a violation of Rule 11 (b) of the Federal Rules of Civil Procedure.

## II.

### FACTUAL BACKGROUND

6.  Plaintiffs are residents of Cameron and Hidalgo counties who have filed their Complaint alleging, *inter alia*, that Defendant Allstate Texas Lloyds Company, ("Allstate"), violated various provisions of the Texas Insurance Code and Texas Deceptive Trade Practices Act in the manner in which it considered Plaintiffs' claims made under their Texas homeowner's policies.  Plaintiffs further allege breach of fiduciary duty, breach of contract and violation of Allstate's duty of good faith and fair dealing.  The policies at issue contain identical language, as they are the standard Homeowners-B policies mandated by the Texas Department of Insurance.  Further, all of Plaintiffs' claims were administered by the same Allstate Houston claims office.

2

## III.

## ARGUMENTS AND AUTHORITIES

**As to Defendant's Motion to Transfer Venue:**

7.  **Defendant's Motion to Transfer Venue is Defective As a Matter of Law.**  The movant in a motion to transfer venue must support such motion with discovery, affidavits or other proof containing detailed factual statements supporting the grounds stated in the motion. *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756-7 & n.2 (3rd Cir. 1973); *Simon v. Ward*, 80 F.Supp.2d 464, 471 (E.D. Pa. 2000).  Mere conclusions by counsel do not justify a transfer. *Scheidt v. Klein*, 956 F.2d 963, 966 (10th Cir. 1992).  Therefore, Defendant's Motion is not even worthy of consideration and should be denied.

8.  **Plaintiffs' Choice of Forum Is Entitled to Great Weight.**  It is the plaintiff's privilege to choose the forum and such choice is "highly esteemed". *Time Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966).  Unless the balance of the analysis is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. *Gulf Oil v. Gilbert* 330 U.S. 501, 508-09, 67 S.Ct. 839, 843 (1947).  In a very comprehensive analysis of the relevant issues surrounding a motion to transfer venue, (and reminiscent of the captivating prose of the late John R. Brown, Chief Justice, Fifth Court of Appeals), Judge Heartfield of the Eastern District of Texas notes that: "To prevail, the litigant must demonstrate that the balance of convenience and justice *substantially* weighs in favor of the transfer." *Mohamed v. Mazda Motor Corporation*, 90 F. Supp.2d 757, 768 (E.D. Tex. 2000).  Moreover, a plaintiff in federal court is not required to bring suit in any particular division within a district, which is precisely what Defendant is requesting in its motion to transfer this case to the McAllen Division. As

3

long as the filing is in the proper *district*, plaintiff has complied with 28 U.S.C. 1391(a) and venue should not be transferred to another *division*. *Mohamed*, 90 F.Supp.2d at 768.

9. **Defendant Has Failed to Sustain Its Burden Under 28 U.S.C. 1404(a).** Boiled down to its essential element, it is the Defendant's burden to show with competent evidence that McAllen would be substantially more convenient for the parties and witnesses than Brownsville. As previously stated, Allstate has offered no evidence whatsoever to support its motion choosing to rely instead on speculative statements of its counsel.[1] However, even if this Court were to consider the merits of such speculation, Allstate has not sustained its substantial burden. First, there is no evidence or reason to believe that trying this case in Brownsville as opposed to McAllen would inconvenience Allstate, a national company doing business throughout Texas. The Court can take judicial notice that the distance between Brownsville and McAllen is a mere 67 miles.[2] Far greater distances have been held insignificant in considering a motion to transfer venue based on convenience. In *Mohamed, supra*, the Court held that the 150 miles between Dallas and Marshall Texas was "negligible" and did not justify a transfer of venue. *Mohamed*, 90 F.Supp.2d at 776. Likewise, an additional 200 miles was found by the Court in *Leesona Corp. v. Duplan Corp.* 317 F.Supp. 290, 300 (D. R.I. 1970) to be "insignificant". Even a plane ride of three hours was deemed insufficient to justify a transfer of venue. *Crystal Semiconductor Corp. v. OPTi, Inc.* 1997 WL 798357, pg. 8 (W.D. Tex. 1997). (See Exhibit H).

---

[1] "In addition, the records, claims, reports and documents relevant to issues such as alternative living expenses are *most likely* located in the Hidalgo County area for the Hidalgo County plaintiffs" See Defendant's Motion pg. 7.

[2] *American Automobile Association* , map of the State of Texas, 1996 edition.

In support of its assertion that Brownsville is not convenient, Defendant boldly asserts that; *"Witnesses relevant to the Hidalgo claims, such as mold inspectors and contractors who provided repair and remediation estimates are generally located in Hidalgo County, Texas."[3]* In fact, nothing could be further from the truth. The contractors hired by Allstate were: (a) Rimkus Company, Corpus Christi, Texas, (See Affidavit of Michael Tellez, Exhibit A, pg. 2); (b) Excell Restoration Services, Inc. San Benito, Cameron County, Texas, (See Affidavit of Nora Garcia, Exhibit B, pg. 1); (c) CCAC, Corpus Christi, Texas, (See Exhibit G); and (d) R.A. Schmidt Company, Inc., Corpus Christi, Texas, (See Exhibit G ). The contractors hired by Plaintiffs included: (a) National Abatement Company, Houston, Texas, (See Affidavit of Michael Tellez, Exhibit A, pg. 3); (b) Aaron's Environmental Services, Inc., Corpus Christi, Texas, (See Affidavits of Plaintiffs, A-E); and (c) Guerra-Prats & Companies, Corpus Christi, Texas, (See Affidavits of Plaintiffs, A-E). In addition, all six of the Plaintiffs' claims were administered from the same Allstate office in Houston. (See Exhibit F).

Defendant is correct that the focus of this inquiry should be on *key* witnesses. This lawsuit will involve proof of Defendant's liability for Plaintiffs' damages. In addition to the Plaintiffs, the key witnesses on liability are the Houston adjusters and their supervisors who engaged in the illegal conduct alleged. Such witnesses and their documents are located in Houston, Texas. The key witnesses on damages are the contractors who will testify about how much it will cost to fix the Plaintiffs' homes. On the Plaintiffs' side, such witnesses and their documents are located in Corpus Christi and Houston. On the Defendant's side, they are located in Corpus Christi. Although

---

[3] Defendant's Motion, pg. 7, paragraph 11.

admittedly a rather minor consideration, counsel for Defendants are located in Houston, and for Plaintiffs in McAllen, Austin and Houston. Under these circumstances, to suggest that McAllen is somehow more convenient that Brownsville is preposterous and belies the facts.

**As to Defendant's Motion to Sever:**

10. **Joinder is Appropriate Under Rule 20(a), F.R.C.P.** Plaintiffs' exhibits attached hereto demonstrate that they are asserting the right to relief in respect to, or arising out of the same transaction or occurrences, and that there are questions of law and fact common to all of them. Specifically, each Plaintiff was adversely affected by Allstate's corporate policy to unlawfully engage in practices designed avoid or minimize the payment of claims covered by the Texas Homeowner's-B policies. This policy included the use of economic coercion with respect to those Plaintiffs who were seeking alternative living expenses under their policies. In each case, this policy was implemented by the Houston based adjusters and their supervisors.

"The Supreme Court has instructed the lower courts to employ a liberal approach to permissive joinder of claims *and* parties in the interest of judicial economy:" *Alexander v. Fulton County, Ga.* 207 F.2d 1303, 1323 (11th Cir. 2000). Quoting the United States Supreme Court, the Eleventh Circuit notes: "Under the Rules, the impulse is towards entertaining the **broadest possible scope** of action consistent with fairness to the parties; **joinder of claims, parties and remedies is strongly encouraged**." (emphasis added). *Alexander, supra*, citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 724, 86 S.Ct. 1130, 1137 (1966). In its analysis of the two-prong tests of Rule 20(a), the Court in Alexander notes two significant concepts: First, that the term "same transaction or

occurrence" is "flexible" in its application and includes "all logically related events entitling a person to institute a legal action against another..." *Alexander*, supra, at. 1323. Second, that Rule 20(a) does not require that *all* questions of law and fact raised by the dispute be common, but only that *some* questions of law or fact be common to all parties. *Alexander*, supra at 1324.

The court in *Alexander* affirmed the trial court's decision to try together the racial discrimination in employment claims of eighteen individuals. It is hard to imagine litigation more fraught with potential prejudice than employment discrimination claims involving eighteen different employees at different time periods, with different jobs, and different skill levels and performance histories. Yet, the policy inherent in Rule 20(a) permitted the joinder and trial of such claims. Additionally, the concern of Allstate that it would somehow be prejudiced by the trial of these properly joined cases can be eliminated through limiting instructions in the charge to the jury.

11. **The Naked Accusation of "Impermissible Forum Shopping" Violates Rule 11, F.R.C.P.**

Plaintiffs' counsel filed this lawsuit in the Brownsville Division with absolutely no control over its assignment. It is ludicrous to suggest that Plaintiffs' counsel was impermissibly forum shopping when he had no ability to select any particular court to which it would be assigned. Use of the term "impermissible" suggests Plaintiffs' counsel's conduct was not permitted by the Rules or, stated another way, was prohibited. As such, Defendant has accused Plaintiffs' counsel of conduct that, if true, would arguably be considered unethical and a violation of Section 3.01 of the *Texas Rules of Professional Conduct*, Article IV (6) of the *Texas Lawyer's Creed*, and *Appendix A,*

7

*Rules of Discipline, United States District Court, Southern District of Texas, (effective October 10, 1996)*, paragraphs (A) and (B). Allstate makes these serious allegations without a shred of evidence to support them and in violation of Rule 11(b), F.R.C.P.

Additionally, the suggestion that Plaintiffs' counsel filed these cases *"solely in an effort to avoid having their cases heard before the Honorable Randy Crane"*, is equally offensive.[4] While Allstate may prefer to have all of the cases in the Southern District of Texas heard in a particular division by a particular judge, such is not their prerogative under federal law.

Further, allegations concerning a plaintiff's motivation in the selection of a forum have been found to be "irrelevant" to a court's consideration of a motion to transfer venue. See *Mohamed* supra 90 F.Supp at 772. Indeed, the availability of more than one appropriate forum, as is the case here, not only permits but also invites counsel to make a selection. *McCuin v. Texas Power & Light Co.* 714 F.2d 1255, 1261-62 (5th Cir. 1983). There is nothing sinister, therefore, in Plaintiffs' decision to file this case in Brownsville. Given these facts, they could have just as easily have filed it in Houston.

Thus, if the choice of forum by counsel is irrelevant to the Court's consideration of Defendant's Motion, why did Allstate make such a serious and unfounded charge? That is precisely the inquiry Plaintiffs urge this Court to undertake. Counsel for Allstate should be compelled to present this Court with evidence, if any they have, to show that Plaintiffs' counsel acted in any way improperly in connection with the filing of this lawsuit. Failing which, an appropriate admonishment from this Court would seem to be in order.

---

[4] Defendant's Motion, pg. 8.

8

Plaintiffs are prepared to present these matters at an oral hearing should it please this Honorable Court.

Wherefore, Plaintiffs urge this Court to deny Defendant's Motion to Sever and Transfer Venue.

Respectfully submitted,

Dan Downey
Attorney In Charge
Texas State Bar No. 06085400
Southern District of Texas Bar No. 459
700 Louisiana Suite 4000
Houston, Texas 77002
713-222-8080
713-222-0066 (fax)

Peter E. Ferraro
Texas State Bar No. 06934600
1104 San Antonio St.
Austin, Texas 78701
512-474-7742
512-474-5306 (fax)

John Eaton
Texas State Bar No. 06382500
Southern District of Texas Bar No. 2208
2208 Primrose, Bldg. D
Mc Allen, Texas 78504
956-631-9400
956-687-9867 (fax)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was served upon counsel for Defendant by certified mail, return receipt requested on this the 15th day of January, 2004.

Dan Downey

TABLE OF CONTENTS FOR EXHIBITS

1.    Affidavit of Michael Tellez                Exhibit A

2.    Affidavit of Nora Garcia                  Exhibit B

3.    Affidavit of Olga Contreras               Exhibit C

4.    Affidavit of Rueben Santillana            Exhibit D

5.    Affidavit of Eluterio Morales             Exhibit E

6.    Letters of Allstate Houston Office        Exhibit F

7.    Letters of Selected Contrators            Exhibit G

8.    *Crystal Semiconductor v. OPTi*           Exhibit H

# EXHIBIT A

## AFFIDAVIT OF MICHAEL TELLEZ

STATE OF TEXAS

COUNTY OF CAMERON

Before me the undersigned notary, on this day personally appeared Michael Tellez, a person whose identity is know to me. After I administered an oath to him, upon such oath he said:

" My name is Michael Tellez. I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct unless otherwise stated. My wife and I are plaintiffs in this action and the owners of the subject home located at 1833 Gary Player Cir., Harlingen, Texas.

A.    Allstate refused to accept responsibility for claims covered by the policy. During December 2000 and January 2001, I discovered multiple water leaks in the pipes in my home. I called my Allstate Agent, who told me to file my claims by calling the Houston claims office which I did. Thereafter, Allstate Adjuster, Dennis Satterfield acknowledged that I had damage in the home, including mold infestation in the attic and around the air conditioning unit. However, he asserted that damage "above the ceiling" was not covered and that he would not pay to remediate such damage. This was precisely where the water leaks had occurred and damage resulted, including toxic mold infestation.

B.    Allstate refused to open a separate claim on each covered loss. When I filed my claims, the Allstate representative with whom I spoke on the telephone in the Houston Allstate office told me that although I had experienced multiple water intrusions, approximately 13 in number, Allstate was only going to open up three

1

claims and no more This refusal to open more that three claims meant the benefits under the policy were limited and the company refused to tender sufficient funds to cover my alternative living expenses or repair and remediate my home as I understood was required by the policy and as more particularly stated below.

C.   Allstate delayed the investigation and payment of my claim including alternative living expenses. As stated above, Allstate acknowledged that there was mold in the house but took no action to address the problem and did not conduct any tests on the mold. After my wife, children and I began to experience headaches and nose bleeds, I asked Allstate to perform an air quality test. This test was finally performed in May of 2001 on behalf of Allstate by Rimkus Company of Corpus Christi, Texas. Upon information and belief, the report was sent to Allstate in July of 2001 but the report and its findings were never given to me until October of 2001. After approximately one year, Allstate sought to coerce me into accepting an amount that was insufficient to repair my home by threatening to suspend the alternative living expenses. Allstate knew that I was paying a mortgage on my damaged home and was required, in addition to renting a new house, to also rent furniture and appliances. Allstate had paid such expenses so it knew the financial hardship my family would experience if they suspended the alternative living expenses. This coercion was expressed to me Dennis Satterfield who told me in May or June of 2002 that he was going to pay me $59,000.00 as the total amount that Allstate would pay to repair my home, remediate the toxic mold and replace the damaged personal property. This amount also included two more months of alternative living expenses which Allstate was going to suspend.

2

He told me, in effect, to take it or leave it. Allstate must have known that this amount was insufficient to repair my home because a contractor hired by me, National Abatement Company of Houston, Texas, a contractor who Dennis Satterfield acknowledged was on Allstate preferred vendor list, quoted the amount of $90,000.00 just to remove and remediate the toxic mold

D.    As stated above, Allstate ignored valid estimates from National Abatement Company, a contractor recognized by Allstate itself as qualified to repair the home. In fact, National Abatement Company had previously worked for Allstate in similar cases.

E.    As stated above, Allstate suspended alternative living expenses in June of 2002 because, in the words of adjuster this had "gone on too long." Any delays in concluding this matter were caused by Allstate including, among other things, waiting three months to disclose the report of their own contractor, Rimkus, concerning the toxic mold growing and continuing to grow in my house.

_Michael K. Tellez_
Michael Tellez

Sworn to and subscribed before me by Michael Tellez on _Jan. 13_, 2004.

_Dora A. Garcia_
Notary Public in and for the
State of Texas

My commission expires: 5-1-2005

Dora Alicia Garcia
Notary Public, State of Texas
My Commission Expires
MAY 01, 2005

3

# EXHIBIT B

## AFFIDAVIT OF NORA GARCIA

STATE OF TEXAS

COUNTY OF HIDALGO

Before me the undersigned notary, on this day personally appeared Nora Garcia, a person whose identity is known to me. After I administered an oath to her, upon such oath she said:

"My name is Nora Garcia. I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct unless otherwise stated.

A.    Allstate refused to accept responsibility for claims covered by the policy. During December of 2001 and January of 2002, I reported multiple water leaks in the pipes in my home to my Allstate agent in McAllen, Texas. I was told to call the Allstate claims office in Houston, Texas to file may claim. In the past, when I discovered a leak and called Allstate, I was told by Allstate representatives not to report such events or file a claim unless the amount necessary to fix the damage was more than my deductible of $500.00. If the damage was less than that amount I was told that there was no need to file a claim. I called the Houston office and was given the number of a "remediation company" and told to call it. I believe this company was called Excell Restoration Services, Inc. based in Houston, Texas with offices in San Benito, Cameron County, Texas. The representatives of Allstate said that this company worked with Allstate and would come to my home and estimate the damages. In December 2001, representatives from this company came to my house and said they were sending the results to

1

Allstate in Houston. I called the Allstate Houston claims office in late January 2002 to find out the results of the tests performed by the remediation company. I spoke with a woman who told me that my home was infested with toxic mold and that I should move out of it. She told me not to worry that Allstate would fix the home, clean up the mold and reimburse my expenses while I was out of the home. She told me to go to a hotel and Allstate would reimburse me for the expense. I told her I did not have the money to do so and she told me to put the hotel charges on my credit card. When I told her I did not have a credit card I could use for such purpose, she said she didn't know what else to tell me. I moved in with my sister in January of 2002 and didn't hear anything back from Allstate about my claim. In May, 2002 I called the Allstate Houston claims office again and was told by a woman that Allstate was going to send a second "remediation company" located in Harlingen, Texas. Representatives of this company came and inspected my home. In June of 2002, I again called the Allstate Houston claims office and spoke to a man who said he was a supervisor. He said he would review the file and call me back. In July of 2002 I received a written request from the Allstate office in Irving, Texas seeking proof of ownership for some of my personal items that were damaged. In July of 2002 the supervisor at the Allstate Houston claims office with whom I had spoken in June called me to inform me that Allstate was not going to pay to fix my house. I told him I was still paying my mortgage on the mold infested house and could not afford to pay rent on another place. He was very rude and hung the phone up on me.

2

B.      Allstate refused to open a separate claim on each covered loss.  When I filed my

claims, the Allstate representative I spoke with said that although I had

experienced four water leaks, Allstate was only going to open up one claim.

C.      Allstate delayed the investigation and payment of my claim for approximately six

months. As stated above, when I filed my claim in December 2001 and January

2002, I was told to get out of the house and that the claim would be covered and

that Allstate would fix my home and reimburse me alternative living expenses.  I

relied on this promise in deciding what to do about my living situation and the

house itself.  Six months later and after they had sent two "remediation

companies" to my home to prepare an estimate, they refused to pay my claim.

D.      As stated above, Allstate apparently ignored valid estimates from two of its own

remediation contractors.  In addition, I have sent Allstate estimates from other

contractors, to fix my home but they have apparently been ignored as well.

Estimates to fix my home, prepared by Aaron's Environmental Services of

Corpus Christi, Texas, and Guerra Prats & Companies of Corpus Christi were sent

to Allstate.

E.      As stated above, Allstate told me my house was infested with toxic mold and to

move out of it.  At that time, the Allstate Houston claims office promised to

reimburse me for my expenses of living out of my home while they arranged to

have the home fixed.  After I had been out of my home for six months, they

refused to honor my claim.  As of this date, Allstate has paid nothing on my claim

and I am still out of my house.

NORA GARCIA

3

Sworn to and subscribed before me by Nora Garcia on the _13th_ day of _January_, 2004.

MARTHA SCHULLER
Notary Public
STATE OF TEXAS
My Comm Exp 10-07-2004

Notary Public in and for the
State of Texas

My commission expires:
_10/7/04_

4

# EXHIBIT C

## AFFIDAVIT OF OLGA CONTRERAS

STATE OF TEXAS

COUNTY OF HIDALGO

 Before me the undersigned notary, on this day personally appeared Olga Contreras, a person whose identity is known to me.  After I administered an oath to her, upon such oath she said:

 "My name is Olga Contreras.  I am capable of making this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct unless otherwise stated.

A. Allstate refused to accept responsibility for claims covered by the policy.  During 1999, the pipes under my bathroom sink burst and flooded my home including the kitchen, living room, dining room, hallway, master bathroom and pantry.  I reported these leaks to my Allstate agent, Robert Brown the next day in McAllen Texas.  He gave me another number to call to report my claim and I spoke to an adjuster whose name I believe was Mr. Carvajal.  The adjuster spoke to me in Spanish and told me to hire someone to remove the water and dry the area.  He told me it would cost approximately $500.00.  I told him we couldn't afford that much and so my husband and I removed the water immediately with a "shop-vac", placed fans in the area to dry the carpet and performed repairs under the sink.  This Allstate adjuster was very rude and told me he had many cases and that he would come to my house in the next three days.  He never came nor did any other representatives of Allstate come to my home to investigate my claim.  Thereafter, black and greenish mold grew under the sink and under the carpet.  In

1

April of 2002 and October of 2002 Allstate was sent estimates from Guerra-Prats & Companies and Aaron's Environmental Services to fix the home and remediate the mold damage. However, Allstate has denied the claim because they say we did not give them prompt notice of our claim even though we called them the very next day.

B.      Allstate delayed the investigation and payment of my claim. As stated above, I reported the leak to Allstate immediately and all they told me was to hire someone to clean it up. They never came to my home to inspect the damage until I hired an attorney sometime after March of 2002. Then they denied the claim.

C.      As stated above, Allstate ignored valid estimates from two qualified contractors, Guerra Prats & Companies of Corpus Christi, Texas and Aaron's Environmental Services of Corpus Christi, Texas.

<div style="text-align:right">

_Olga Contreras_
OLGA CONTRERAS
</div>

Sworn to and subscribed before me by Olga Contreras on the __13th__ day of __January__, 2004.



MARTHA SCHULLER
Notary Public
STATE OF TEXAS
My Comm Exp 10-07-2004

_Martha Schuller_
Notary Public in and for the
State of Texas

My commission expires:
__10/7/04__

# EXHIBIT D

**AFFIDAVIT OF RUBEN SANTILLANA**

STATE OF TEXAS

COUNTY OF HIDALGO

 Before me the undersigned notary, on this day personally appeared Ruben Santillana, a person whose identity is known to me. After I administered an oath to him, upon such oath he said:

 "My name is Ruben Santillana, I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct unless otherwise stated.

A. Allstate refused to accept responsibility for claims covered by the policy. In January of 2002, I discovered multiple water leaks in the pipes in my home. I called my Allstate Agent who told me to file my claims by calling the Allstate Houston claims office. On April 3, 2002 Allstate was sent a report by Guerra-Prats & Companies detailing the leaks and damages. Shortly thereafter, I was told by Allstate representatives when I called on the telephone, that the mold was not covered under the policy and that Allstate would not pay to remove it. In June or July of 2003, representatives of Allstate performed air quality tests because of the existence of the mold I have asked for the results but Allstate has refused to give them to me. Despite the fact that members of my family have experienced headaches and nosebleeds, Allstate refuses to tell me whether the air quality in my home is dangerous and whether I should move out.

B.     Allstate refused to open a separate claim on each covered loss.  When I filed my claims, the Allstate representative told me that although I had experienced multiple water leaks.  Allstate was only going to open up one claim.

C.     Allstate delayed the investigation and payment of my claim. I filed my claim in January of 2002 but no representatives of Allstate came to look at my home for approximately four months.  Ultimately, I arranged for an inspection by Guerra-Prats & Companies and sent it to Allstate on April 3, 2002. After they received it, they sent someone out to inspect the home.   As a result, they have not paid me any alternative living expenses under the policy.  On April 3, 2003, a request was made to Allstate that they begin paying me alternative living expenses so I could move from the home but that request was refused.  On May 1, 2003, an estimate for mold remediation was performed by Aaron's Environmental Services and sent to Allstate on July 9, 2003, requesting money due under the policy to remediate for mold.  This request was also refused.

D.     Allstate ignored valid estimates from recognized and qualified experts for repair and remediation of the home.  As stated above Allstate was sent reports by Guerra-Prats & Companies of Corpus Christi and Aaron's Environmental Services of Corpus Christi with estimates to fix my home.

RUBEN SANTILLANA

2

Sworn to and subscribed before me by Ruben Santillana on the *13th* day of

*January*, 2004.

MARTHA SCHULLER
Notary Public
STATE OF TEXAS
My Comm Exp 10-07-2004

Notary Public in and for the
State of Texas

My commission expires:

*10/7/04*

3

# EXHIBIT E

## AFFIDAVIT OF ELUTERIO MORALES

STATE OF TEXAS

COUNTY OF HIDALGO

Before me the undersigned notary, on this day personally appeared Eluterio Morales, a person whose identity is known to me. After I administered an oath to him, upon such oath he said:

"My name is Eluterio Morales and I am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct unless otherwise stated. My wife and I are Plaintiffs in this action and the owners of the subject home located at 213 West 7th Street, La Joya, Texas.

A.     Allstate refused to accept responsibility for claims covered by the policy. From August, 2001 through July, 2002, I discovered multiple water leaks in pipes in my home. When the first leaks were discovered, I called my Allstate agent, who told me to file my claims by calling the Houston claims office, which I did. This occurred in August, 2001. The claim adjuster was initially Kendall Bergh, out of the Houston office. Later, Robert Solberg, also of the Houston Allstate office, took over the claim. Allstate sent several inspection teams to my home. I believe they were all from Corpus Christi, however I was never shown their reports. At least two of the inspectors told me I had mold in my home as a result of water leaks. Shortly thereafter, I was sent a check from Allstate in the amount of $1,938.81. I called Kendall Bergh in Houston and told him the amount was insufficient to even begin remediation on the home. Mr. Bergh flatly told me I would be receiving no further money.

1

B.  Allstate refused to open a separate claim on each covered loss.  This refusal to open claims for each of the multiple water leaks meant that the benefits under the policy were limited and the company refused to tender sufficient funds to cover my alternate living expenses or repair and remediate the home as I understood was required by the policy and is more particularly stated below.

C.  Allstate delayed the investigation and failed to responsibly address the damage to my home which was found by persons hired by Allstate for that purpose.  On July 26, 2002, frustrated by the failure of Allstate to responsibly adjust my claim, Guerra-Prats & Companies of Corpus Christi performed an independent inspection on my home for mold which confirmed mold as a result of multiple water leaks.  On May 21, 2003, Aaron's Environmental Services of Corpus Christi performed a mold remediation estimate.  Despite receipt of the Guerra-Prats and Aaron's Environmental reports, Allstate has refused to pay an alternate living allowance to extricate my family from the mold infested environment and has refused to re-evaluate the claim, even after receiving the Aaron's Environmental estimate of over $60,000.00.

D.  Allstate has ignored evidence of toxic mold caused by water intrusion and valid estimates for its remediation and repair.  Further Allstate has failed and refused to provide needed alternate living expenses.

ELUTERIO MORALES

Sworn to and subscribed before me by Eluterio Morales on the _13th_ day of

_January_ 2004.



MARTHA SCHULLER
Notary Public
STATE OF TEXAS
My Comm Exp 10-07-2004

_Martha Schuller_

Notary Public in and for the
State of Texas

My commission expires:

_10/7/04_

3

# EXHIBIT F



Allstate Insurance Co.
1500 City West, Suite 800
Houston, TX 77042

Phone Number: 713-430-2200
Office Hours:    Monday-Friday 8:00-4:30

July 29, 2002

Eaton & McCarthy Law Offices
2208 Primrose, Building D
McAllen, Texas  78504

**ATTENTION:  MR. JOHN H. EATON**

|       |                     |                                            |
|-------|---------------------|--------------------------------------------|
| Re:   | **Company:**        | **Allstate Texas Lloyds Company**          |
|       | **Insured:**        | **MICHAEL TELLEZ**                         |
|       | **Insured Premises:** | **1833 Gary Player Circle, Harlingen, TX 78552** |
|       | **Claim Number(s)** | **8201338160 (Kitchen Pipe Leaks)**        |

Dear Mr. Eaton:

This will acknowledge receipt of your letter of representation of your client's claim of January 16, 2001.  Under your client's homeowners' policy, your clients are required to take certain actions.  Some of your client's duties in case of a loss to covered property caused by a peril insured against, include:

1.    Give prompt written notice to us of the facts relating to the claim:

2.    Protect the property from further damage;

3.    Make reasonable and necessary repairs to protect the property;

4.    Keep an accurate record of repair expenses;

5.    Furnish a complete inventory of damage to personal property showing the quantity, description and amount of loss (attaching all bills, receipts and related documents which justify the figures in the inventory);

6.    As often as we reasonably require:

    a.    Provide us access to the damaged property;
    b.    Provide us with pertinent records and documents we request and permit us to make copies;
    c.    Submit to examination under oath and sign and swear to it.

G52-2



In order to investigate your client's claim, we may also need to come to your client's home to inspect any damaged property. We will contact you regarding the arrangements for the inspection of your client's residence and to obtain any additional pertinent records and documents we may need. Also, we may need to take your client's examination under oath. We will advise you if this is necessary in order to schedule a time and place that is convenient for your client to take this examination under oath.

Please make sure you contact me if you have any questions. Thank you.

Sincerely,

Jim Berghult
Claim Representative

RECEIVED
JUL 3 1 2002

G52-2


You're in good hands.

Allstate Insurance Co.
1500 City West, Suite 700
Houston, TX 77042

Phone Number: 713-430-2200
Office Hours:    Monday-Friday 8:00-4:30

August 14, 2002

Eaton & McCarthy Law Offices
2208 Primrose, Building D
McAllen, Texas  78504-4162

**ATTENTION:  MR. JOHN H. EATON**

RE:    Company Name:    **Allstate Texas Lloyds Company**
             Our Insured:       **NORA N. GARCIA**
             Loss Location:     **5908 North 22nd Lane, McAllen, TX 78504**
             Claim Number:                          D/O/L:
             **8202699817 (HVAC Overflow)        01/05/02**

Dear Mr. Eaton:

This will acknowledge receipt of your letter of representation of your client's claim(s) as listed above.  Under your client's homeowners' policy, your clients are required to take certain actions. Your client's duties in case of a loss to covered property caused by a peril insured against, include:

1.    Give prompt written notice to us of the facts relating to the claim;

2.    Protect the property from further damage;

3.    Make reasonable and necessary repairs to protect the property;

4.    Keep an accurate record of repair expenses;

5.    Furnish a complete inventory of damage to personal property showing the quantity, description and amount of loss (attaching all bills, receipts and related documents which justify the figures in the inventory);

6.    As often as we reasonably require:

      a.    Provide us access to the damaged property;
      b.    Provide us with pertinent records and documents we request and permit us to make copies;
      c.    Submit to examination under oath and sign and swear to it;



Allstate.
You're in good hands.

Based upon the information received, Allstate is in the process of investigating the claim, and reserves all rights in regard to this claim. Presently, there are questions regarding whether Allstate is obligated under the policy for your client's claim. Allstate does not waive any of its rights or defenses with regard to any potential claims under the policy by any action previously taken or by any action taken in the future. Rather, Allstate reserves all of its rights and possible defenses in any way relating to questions raised by any such potential claims

Allstate further reserves the right to bring to your client's attention any additional contractual or legal defenses to payment for any potential claims under the policy which may be warranted by the facts.

Any action taken by Allstate or its authorized representatives, including any action taken in handling, investigating, negotiating settlement, settling and/or defending any claim arising out of the loss will not waive any of the terms and conditions of your client's policy with Allstate, Texas public policy, or Texas law or waive Allstate's right to assert the policy defenses noted above or any other policy defense.

Allstate does not intend by this letter to imply that it will pay or deny this claim. Nothing which Allstate may have done prior to this letter, or may do subsequently, in connection with the investigation of the circumstances surrounding this loss or the adjustment of this loss should be construed or considered in any way as a waiver of any of Allstate's rights or defenses.

Also, we may need to take your client's examination under oath. We will advise you if this is necessary in order to schedule a time and place that is convenient for your client to take this examination under oath.

Please make sure you contact me if you have any questions. Thank you.

Sincerely,

David Myers
Claims Adjuster

RECEIVED AUG 21 2002

**Allstate Insurance Co.**
**1500 City West, Suite 800**
**Houston, TX 77042**

**Phone Number:**     **713-430-2200**
**Office Hours:  Monday-Friday 8:00-4:30**

May 29, 2002

Eaton & McCarthy Law Offices
2208 Primrose, Building D
McAllen, Texas  78504-4162

**ATTENTION:  MR. JOHN H. EATON**

| | | |
|---|---|---|
| **Re:** | **Company:** | **Allstate Texas Lloyds Company** |
| | **Insured:** | **GUILLERMO & OLGA CONTRERAS** |
| | **Insured Premises:** | **116 Daffodil, McAllen, TX 78501** |
| | **Claim Number(s)** | **8203025401 (Plumbing Leak)** |

Dear Mr. Eaton:

This will acknowledge receipt of your letter of representation of your client's claim of April 11, 2002.  Under your client's homeowners' policy, your clients are required to take certain actions. Your client's duties in case of a loss to covered property caused by a peril insured against, include:

    1.      Give prompt written notice to us of the facts relating to the claim:

    2.      Protect the property from further damage;

    3.      Make reasonable and necessary repairs to protect the property;

    4.      Keep an accurate record of repair expenses;

    5.      Furnish a complete inventory of damage to personal property showing the quantity, description and amount of loss (attaching all bills, receipts and related documents which justify the figures in the inventory);

    6.      As often as we reasonably require:

           a.      Provide us access to the damaged property;
           b.      Provide us with pertinent records and documents we request and permit us to make copies;
           c.      Submit to examination under oath and sign and swear to it; and

    7.  Provide a signed and sworn proof of loss on a standard form supplied by us within 91 days of our request.



You're in good hands.

I have enclosed a standard form of a proof of loss. Please have your client answer all of these questions and provide all information requested, to the best of his/her knowledge and belief. Your client then must sign the verification before a notary confirming that the information given in response to the questions in the proof of loss is correct to the best of his/her knowledge and belief. You should send the completed sworn proof of loss to me as soon as possible to permit Allstate to investigate your client's claim promptly. Under the policy, your client must send the sworn proof of loss within 91 days of this request.

In order to investigate your client's claim, we will also need to come to your client's home to inspect any damaged property. We will contact you regarding the arrangements for the inspection of your client's residence and to obtain any additional pertinent records and documents we may need. Also, we may need to take your client's examination under oath. We will advise you if this is necessary in order to schedule a time and place that is convenient for your client to take this examination under oath.

Please make sure you contact me if you have any questions. Thank you.

Sincerely,

Gary Seligman
Claim Representative

Enclosure

RECEIVED

MAY 31 2002



You're in good hands.

Allstate Insurance Co.
1500 City West, Suite 800
Houston, TX 77042

Phone Number: 713-430-2200
Office Hours:     Monday-Friday 8:00-4:30

April 10, 2002

Eaton & McCarthy Law Offices
2208 Primrose, Building D
McAllen, Texas  78504-4162

**ATTENTION:   MR. JOHN EATON**

Re:      **Company:**         **Allstate Texas Lloyds Company**
            **Insured:**               **RUBEN SANTILLANA**
            **Insured Premises:**    **1401 West First Street, Mercedes, TX 78570**
            **Claim Number(s)**     **8202761311 (Water Damage)**

Dear Mr. Eaton:

This will acknowledge receipt of your letter of representation of your client's claim of January 28, 2002.  Under your client's homeowners' policy, your clients are required to take certain actions.  Your client's duties in case of a loss to covered property caused by a peril insured against, include:

1.     Give prompt written notice to us of the facts relating to the claim:

2.     Protect the property from further damage;

3.     Make reasonable and necessary repairs to protect the property;

4.     Keep an accurate record of repair expenses;

5.     Furnish a complete inventory of damage to personal property showing the quantity, description and amount of loss (attaching all bills, receipts and related documents which justify the figures in the inventory);

6.     As often as we reasonably require:

       a.     Provide us access to the damaged property;
       b.     Provide us with pertinent records and documents we request and permit us to make copies;
       c.     Submit to examination under oath and sign and swear to it; and

7.     Provide a signed and sworn proof of loss on a standard form supplied by us within 91 days of our request.



You're in good hands.

I have enclosed a standard form of a proof of loss. Please have your client answer all of these questions and provide all information requested, to the best of his/her knowledge and belief. Your client then must sign the verification before a notary confirming that the information given in response to the questions in the proof of loss is correct to the best of his/her knowledge and belief. You should send the completed sworn proof of loss to me as soon as possible to permit Allstate to investigate your client's claim promptly. Under the policy, your client must send the sworn proof of loss within 91 days of this request.

In order to investigate your client's claim, we will also need to come to your client's home to inspect any damaged property. We will contact you regarding the arrangements for the inspection of your client's residence and to obtain any additional pertinent records and documents we may need. Also, we may need to take your client's examination under oath. We will advise you if this is necessary in order to schedule a time and place that is convenient for your client to take this examination under oath.

Please make sure you contact me if you have any questions. Thank you.

Sincerely,

Gary Seligman
Claim Representative

Enclosure

RECEIVED
APR 1 2 2002


**Allstate.**
You're in good hands.

Allstate Insurance Co.
1500 City West, Suite 800
Houston, TX 77042

Phone Number: 713-430-2200
Office Hours:    Monday-Friday 8:00-4:30

July 31, 2002

Eaton & McCarthy Law Offices
2208 Primrose, Building D
McAllen, Texas  78504

**ATTENTION:  MR. JOHN H. EATON**

> Re:    Company:          **Allstate Texas Lloyds Company**
>        Insured:           **ELUTERIO & ROSA MORALES**
>        Insured Premises:  **213 West 7th Street, La Joya, TX 78560**
>        Claim Number(s)    **8202699791 (Water)**

Dear Mr. Eaton:

This will acknowledge receipt of your letter of representation of your client's claim of August 1, 2001.  Under your client's homeowners' policy, your clients are required to take certain actions. Some of your client's duties in case of a loss to covered property caused by a peril insured against, include:

1.    Give prompt written notice to us of the facts relating to the claim;

2.    Protect the property from further damage;

3.    Make reasonable and necessary repairs to protect the property;

4.    Keep an accurate record of repair expenses;

5.    Furnish a complete inventory of damage to personal property showing the quantity, description and amount of loss (attaching all bills, receipts and related documents which justify the figures in the inventory);

6.    As often as we reasonably require:

   a.    Provide us access to the damaged property;
   b.    Provide us with pertinent records and documents we request and permit us to make copies;
   c.    Submit to examination under oath and sign and swear to it.


You're in good hands.

I have enclosed a standard form of a proof of loss. Please have your client answer all of these questions and provide all information requested, to the best of his/her knowledge and belief.

Your client then must sign the verification before a notary confirming that the information given in response to the questions in the proof of loss is correct to the best of his/her knowledge and belief. You should send the completed sworn proof of loss to me as soon as possible to permit Allstate to investigate your client's claim promptly. Under the policy, your client must send the sworn proof of loss within 91 days of this request.

In order to investigate your client's claim, we will also need to come to your client's home to inspect any damaged property. We will contact you regarding the arrangements for the inspection of your client's residence and to obtain any additional pertinent records and documents we may need. Also, we may need to take your client's examination under oath. We will advise you if this is necessary in order to schedule a time and place that is convenient for your client to take this examination under oath.

Please make sure you contact me if you have any questions. Thank you.

Sincerely,

Gary Seligman
Claim Representative

Enclosure

**Allstate**
You're in good hands

Allstate Insurance Co.
1500 City West, Suite 800
Houston, TX 77042

Phone Number: 713-430-2200
Office Hours:    Monday-Friday 8:00-4:30

July 19, 2002

Eaton & McCarthy Law Offices
2208 Primrose, Building D
McAllen, Texas  78504

**ATTENTION:  MR. JOHN H. EATON**

| | | |
|---|---|---|
| **Re:** | **Company:** | **Allstate Texas Lloyds Company** |
| | **Insured:** | **REBECCA GARZA** |
| | **Insured Premises:** | **213 North Tower Road, Alamo, TX 78516** |
| | **Claim Number(s)** | **8202604115 (Water Damage)** |

Dear Mr. Eaton:

This will acknowledge receipt of your client's claim of October 2, 2001.  Under your client's homeowners' policy, your clients are required to take certain actions.  Your client's duties in case of a loss to covered property caused by a peril insured against, include:

1.    Give prompt written notice to us of the facts relating to the claim:

2.    Protect the property from further damage;

3.    Make reasonable and necessary repairs to protect the property;

4.    Keep an accurate record of repair expenses;

5.    Furnish a complete inventory of damage to personal property showing the quantity, description and amount of loss (attaching all bills, receipts and related documents which justify the figures in the inventory);

6.    As often as we reasonably require:

    a.    Provide us access to the damaged property;
    b.    Provide us with pertinent records and documents we request and permit us to make copies;
    c.    Submit to examination under oath and sign and swear to it; and

7.   Provide a signed and sworn proof of loss on a standard form supplied by us within 91 days of our request.

G52-2

# EXHIBIT G



*Constantly Concerned About Customers*

AIR CONDITIONING AND HEATING



5501 Kostoryz Rd.
Corpus Christi, Texas 78415
361/855-3088  Fax: 361/855-5442
E-mail: ccac@ciris.net  www.ccac-ac.com
Texas License #TACLA003826C

September 9, 2002

Allstate Insurance Company
Attn: Mr. Gary Seligman
1500 City West Blvd. #700
Houston, Texas 77042

RE: Claim #820-260-4115

Dear Mr. Seligman:

At your request, I inspected and tested the home of Ms. Rebecca Garza at 213 N. Tower Road,
Alamo, TX 78516, on August 29, 2002. CCAC Inc. provides a Comfort Checkup consisting of
several tests and physical inspections as follows (see attached Comfort Checkup brochure):

1. A physical inspection on the indoor and outdoor equipment; duct design and
   construction; installation workmanship; attic insulation R-value, ventilation; and all
   aspects pertaining to the whole house envelope.
2. An airflow analysis using a calibrated, digital, TSI flow hood to measure total airflow from all
   supply duct outlets, return air grill(s), and the bath and kitchen exhaust fans.
3. An Infiltrometer/ blower door test to measure air infiltration volume and rate; and, with the
   aid of a smoke pencil, to locate house leakage to the attic, including duct leakage and
   crawlspace, if any.

The house has one, electric/electric, central air-conditioning and heating system and is
approximately 1600 square feet. The following are our findings and conclusions:

Equipment
The heating unit is a Magic Chef, Model #USAU9SF200-2H, electric air handler, installed
vertically in a bedroom closet. This unit is in poor condition. The evaporator coil is dirty and
needs maintenance. The blower assembly is not accessible for inspection.

The outdoor air conditioning condensing unit is a 3.5-ton, Armstrong, Model #CJK429. This unit
is in poor condition. The copper refrigerant lines are not insulated where visible.

CCAC Inc. believes the system may be oversized for the square footage of this structure. A
licensed HVAC contractor, trained in the ACCA Manual J load calculation, should determine the
proper sizing.

Duct Systems
Duct systems should be designed using ACCA Manual D with a total of 400 CFM per ton of air
passing through the evaporator coil during the cooling mode. CCAC Inc. used a digital, TSI
calibrated flow hood to measure the airflow on each duct run (see attached airflow report).

# EXCELL

## RESTORATION SERVICES Inc.
Mold Remediation Specialist
940 Anzalduas
San Benito TX 78586
(956) 390-5909
Fax: (956) 399-2930

## Authorization

**To Insurance Company Interest and To Whom It May Concern:**

I/We here by authorize **Excell Restoration Services Inc.** to engage in assisting with the adjusting of my Property Loss located at:

5908   N. 22ND LANE, MCALLEN, TX 78504

I/We give permission to ___ALLSTATE___ Insurance Company to **assign Excell Restoration Services Inc.** as a payee on our Insurance draft for completed demolition, remediation, pack-out, contents cleaning work and build back.

I/We also give **Excell Restoration Services Inc.** permission to mitigate any loss covered by our insurance policy.

I/We here by agree to pay all deductibles to said loss at or before work commences.

Signature _Nora M Garcia_            Date _1 - 12 - 02_

Signature_____            Date_____

# R.A. SCHMIDT COMPANY, INC.

PO BOX 18848 • CORPUS CHRISTI, TX 78480-8848 • Telephone (361) 937-3679, • Fax (361) 939-8173 # MPL18331

September 04, 2002

Gary Seligman                          Rebecca Garza
AllState Insurance                     213 N. Tower Rd.
1500 City West Blvd. #700              Alamo, TX. 78516
Houston, TX. 77042                     Claim# 820-260-4115

**RAS - 22610**          Scheduled Test Date: **08/29/02**          Time:**9:00 a.m.**

## HYDROSTATIC TEST

A Hydrostatic test was performed on the Domestic Water System at the above residence. Starting test pressure, (68psi) after fifteen (15) minutes, ending test pressure (68psi) indicating no loss in the Domestic Water System. The galvanized and PVC piping seems to be in a satisfactory condition and has not been rerouted, altered or repaired. Did not perform visual inspection on any water supply lines above hallway restroom. Visually inspected Bath #2 vent.

## STATIC TEST

A Static test was not performed on the sanitary plumbing system at the above residence. Hydrostatic and Above grade testing only requested. Foundation is pier & beam and slab. Residence is approximately forty-eight (48) years old.

## LOSS LOCATE / ISOLATION TEST

A Loss Locate / Isolation test was not performed on the sanitary plumbing system at the above residence.

## SHOWER PAN TEST

A Shower Pan test was not performed on the sanitary plumbing system at the above residence. **Bathtubs only.**

**Garza Residence continued-**

Allstate Insurance Company
1500 City West , Suite 700
Houston, TX 77042


Allstate.
You're in good hands.

8/26/02

Eaton & McCarthy Law Offices
1104 San Antonio Street
Austin, Texas  78701

        RE:  Allstate Insured: REBECCA GARZA
             Allstate Policy #: 216808615
             Allstate Claim #: 8202604115
             Date Of Loss: 10-02-01

Dear  Eaton & McCarthy:

I am writing you to follow-up on your claim.  We are now awaiting the following

             The report from: CCAC (Corpus Christi)
             Assignment Type: HVAC
                 Phone #: 361-855-3088

The  vendor will call to schedule an appointment for inspection.  We anticipate  they
will call to schedule the appointment within one week from the date of our
conversation.  If you have not heard from them within this time frame, please contact
us.  Should any scheduling conflicts arise, please contact me immediately so I can
assist you in attempting to resolve the situation.


Once the report is completed, a copy is mailed to you and us for review and further
handling.  We will contact you once we review the report.

If you wish to discuss this matter further, please call me.


Sincerely,

*Cary Seligman*  (D. 6)

Gary Seligman
Claims Adjuster
1-800-767-5607  Ext. 2798

CC:


G52-2

Allstate Insurance Company
1500 City West, Suite 700
Houston, TX 77042



8/26/02

Eaton & McCarthy Law Offices
1104 San Antonio Street
Austin, Texas 78701

   RE: Allstate Insured: REBECCA GARZA
      Allstate Policy #: 216808615
      Allstate Claim #: 8202604115
      Date Of Loss: 10-02-01

Dear Eaton & McCarthy:

I am writing you to follow-up on your claim. We are now awaiting the following

     The report from: R A Schmidt (Corpus Christi)
     Assignment Type: Leak Detection
      Phone #: 361-937-3679

The vendor will call to schedule an appointment for inspection. We anticipate they will call to schedule the appointment within one week from the date of our conversation. If you have not heard from them within this time frame, please contact us. Should any scheduling conflicts arise, please contact me immediately so I can assist you in attempting to resolve the situation.


Once the report is completed, a copy is mailed to you and us for review and further handling. We will contact you once we review the report.

If you wish to discuss this matter further, please call me.



Sincerely,

*Gary Seligman (b.l.)*

Gary Seligman
Claims Adjuster
1-800-767-5607  Ext. 2798

CC:

G52-2

# EXHIBIT H

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

Page 1

United States District Court, W.D. Texas.

**CRYSTAL SEMICONDUCTOR
CORPORATION, Plaintiff,**
v.
**OPTI, INC. and Tritech Microelectronics
International, Inc. and Tritech
Microelectronics International PTE Ltd.,
Defendants.**

**No. A 97-CA-026 SS.**

July 14, 1997.

Floyd R. Nation, Arnold White & Durkee, Austin, TX, Wayne M. Harding, Arnold, White & Durkee, Houston, TX, Richard C. Auchterlonie, Arnold, White & Durkee, Houston, TX, Kevin S. Kudlac, Arnold, White & Durkee, Houston, TX, Brian W. Peterman, Jones, O'Keefe & Egan, L.L.P., Austin, TX, for Crystal Semiconductor Corporation, plaintiff.

Barry Kent Bishop, Clark, Thomas, Winters et al, Austin, TX, Barry K. Bishop, Clark, Thomas & Winters, Austin, TX, Martin G. Wiele, Clark, Thomas & Winters, Austin, TX, Mark D. Rowland, Robert J. Goldman, Fish & Neave, Palo Alto, CA, for Opti, Inc., defendant.

James W. Cannon, Jr., Akin, Gump, Strauss, Hauer & Feld, Austin, TX, Gary W. Hamilton, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, TX, Nanette K. Beaird, Akin, Gump, et al, Austin, TX, James B. Gambrell, Akin, Gump, Strauss, Hauer & Feld, Austin, TX, for Tritech Microelectronics International, Inc., defendant.

James W. Cannon, Jr., Gary W. Hamilton, Nanette K. Beaird, James B. Gambrell, (See above), for Tritech Microelectronics International PTE Ltd, defendant.

James W. Cannon, Jr., Akin, Gump, Strauss, Hauer & Feld, Austin, TX, Gary W. Hamilton, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, TX, Nanette K. Beaird, Akin, Gump, et al, Austin, TX, James B. Gambrell, Akin, Gump, Strauss, Hauer & Feld, Austin, TX, for Tritech Microelectronics International, Inc., counter-plaintiff.

James W. Cannon, Jr., Gary W. Hamilton, Nanette K. Beaird, James B. Gambrell, (See above), for Tritech Microelectronics International PTE Ltd, counter-plaintiff.

Floyd R. Nation, Arnold White & Durkee, Austin, TX, Wayne M. Harding, Arnold, White & Durkee, Houston, TX, Richard C. Auchterlonie, Arnold, White & Durkee, Houston, TX, Kevin S. Kudlac, Arnold, White & Durkee, Houston, TX, Brian W. Peterman, Jones, O'Keefe & Egan, L.L.P., Austin, TX, for Crystal Semiconductor Corporation, counter-defendant.

**ORDER**

SPARKS, J.

*1 Before the Court are the Motion by Defendant TriTech Microelectronics International, Inc. ("TriTech.Inc.") to Dismiss or Transfer [# 12], the Motion by Defendant TriTech Microelectronics International Pte Ltd. ("TriTech Pte") to Dismiss or Transfer [# 13], the Motion by Defendant OPTi, Inc. ("OPTi") to Dismiss or Transfer [# 17], and the responses by Crystal Semiconductor Corporation ("Crystal") and the replies by each of the defendants thereto. After carefully considering the parties' pleadings and the applicable law, the Court concludes that the defendants' motions to dismiss or transfer should be denied.

This is a suit for patent infringement. Crystal is the patent holder of United States Patent No. 4,746,899, a "method for reducing deleterious effects on the analog-to-digital conversion process of electrical noise generated by digital logic circuitry," United States Patent No. 4,851,841, a "method for improving the noise characteristics of an A/D converter of the oversampling type," and United States Patent No. 5,220,483, a "switched-capacitor structure in an integrated circuit," (the "patents-in-suit"). Crystal is a corporation incorporated under the laws of Delaware with its principal place of business in Austin, Texas. Crystal is a wholly-owned subsidiary of Cirrus Logic, Inc., ("Cirrus Logic"), a corporation with its headquarters in Fremont, California. TriTech, Inc. is a Delaware corporation with its principal place of business in San Jose, California. TriTech Pte, an affiliate of TriTech, Inc., is a corporation organized

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                          Page 2
44 U.S.P.Q.2d 1497
**(Cite as: 1997 WL 798357 (W.D.Tex.))**

under the laws of Singapore with its principal place of business in Singapore. Finally, OPTi is a corporation incorporated under the laws of California with its principal place of business in Milpitas, California. Crystal alleges that the defendants infringe on the patents-in-suit by making, importing, using, offering to sell and/or selling [FN1] the TriTech TR88015 series products and the OPTi 82C931 series products.

> FN1. Crystal also alleges that the defendants actively induce others to make, import, use, offer to sell, and/or sell, and contribute to the making, importing, using, offering to sell, and/or selling of the infringing products.

The TriTech, Inc. and TriTech Pte (collectively, TriTech) originally moved to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406 for improper venue. Alternatively, TriTech moved to transfer this case to the Northern District of California [FN2] pursuant to § 1406 or for the convenience of the parties pursuant to 28 U.S.C. § 1404. In addition, TriTech Pte sought to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficiency of service of process. After a rather convincing response by Crystal, TriTech voluntarily withdrew its Rule 12(b) motions to dismiss for lack of personal jurisdiction, improper venue, and insufficiency of service of process in it reply. TriTech now only seeks a convenience transfer pursuant to § 1404 to the Northern District of California. OPTi, on the other hand, seeks to dismiss the plaintiff's action pursuant to § 1406 for improper venue, or, alternatively, to transfer this case to the Northern District of California pursuant to either § 1406 or § 1404. The Court will consider OPTi's motion to dismiss or transfer for improper venue first.

> FN2. Fremont, San Jose, and Milpitas are all located within a ten- mile circumference in the Northern District of California.

**I. IMPROPER VENUE**

**\*2** Because this is a suit for patent infringement, the law of the Federal Circuit and not the Fifth Circuit binds this Court, even on matters concerning personal jurisdiction and, presumably, the closely related issue of venue. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564-65 (Fed.Cir.) (stating that, although issues of personal jurisdiction are generally procedural in nature, they are sufficiently related to substantive patent law, and thus the law of the Federal Circuit controls), *cert. dismissed,* 512 U.S. 1273, 115 S.Ct. 18, 129 L.Ed.2d 917 (1994). The plaintiff bears the burden of proving that venue is proper in the Western District of Texas ("Western District"). *See Bullion v. Gillespie,* 895 F.2d 213, 216-17 (5th Cir.1990). The venue statute relating to patent infringement claims provides:

> Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

28 U.S.C. § 1400. In determining where a defendant "resides" for venue purposes, courts must look to the general venue statute, 28 U.S.C. § 1391(c). *See VE Holding Corp. v. Johnson Gas Appliance Co. .,* 917 F.2d 1574 (Fed.Cir.1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). That statute provides:

> For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time the action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

28 U.S.C. § 1391(c). Reading the statutes together, the plaintiff must demonstrate that personal jurisdiction over OPTi exists in the Western District of Texas, and cannot aggregate OPTi's contacts within the entire state of Texas, in order to establish that venue is proper here.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

Page 3

A non-resident defendant is subject to personal jurisdiction in a federal district court if (1) the defendant is within the reach of the forum state's long arm statute, in this case Tex.Civ.Prac. & Rem .Code Ann. §§ 17.042- .043, and (2) due process is satisfied. *See Beverly Hills Fan,* 21 F.3d at 1569 (stating that courts must look to the relevant state's long-arm statute even when the cause of action is purely federal). Because the Texas long-arm statute is co-extensive with the limits of due process, *see Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 372 (5th Cir.1987), our sole inquiry is whether the Court's exercise of personal jurisdiction over OPTi comports with due process. *See Viam Corp. v. Iowa Export-Import Trading Co.,* 84 F.3d 424, 427 (Fed.Cir.1996); *Akro Corp. v. Luker,* 45 F.3d 1541, 1544 (Fed.Cir.) (stating that federal courts have personal jurisdiction over a nonresident defendant in federal question cases to the extent that federal constitutional due process limits allow), *cert. denied,* 515 U.S. 1122, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995). [FN3]

FN3. *Beverly Hills Fan* requires trial courts to consider, in a separate analysis, whether the "particulars" of the long-arm statute have been satisfied "even though it could be argued that a lesser standard would meet due process." *See id.* at 1569 n. 23. As indicated above, subsequent Federal Circuit panels do not follow this rule. *See SGS-- Thompson Microelectronics, Inc. v. Int'l Rectifier Corp.,* 31 F.3d 1177, 1994 WL 374529 (Fed.Cir.) (stating in an unpublished opinion that, because the Texas long-arm statute extends to the limits of due process, the "sole inquiry" is whether due process requirements have been met), *cert. denied,* 513 U.S. 1044, 115 S.Ct. 637, 130 L.Ed.2d 544 (1994). The Court is aware that, in the Federal Circuit, "earlier decisions prevail unless overruled by the court en banc, or by other controlling authority such as intervening statutory change or Supreme Court decision." *See Texas Am. Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557, 1561 (Fed.Cir.1995). The Court, however, is of the opinion that *Akro, Viam,* and *SGS-Thompson* adopt the superior and

certainly more logical approach. The Supreme Court has long concluded that the requirements-- *i.e.,* the particulars--of the Texas long-arm statute are satisfied as long as the exercise of personal jurisdiction comports with due process. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 412-13, 104 S.Ct. 1868, 1871-72, 80 L.Ed.2d 404 (1984). Until *Beverly Hills Fan,* no more was required. Because *Beverly Hills Fan* potentially places an additional burden on plaintiffs in contravention of clear and unambiguous Supreme Court precedent, that aspect of the *Beverly Hills Fan* opinion carries no precedential weight. Therefore, the Court, in line with *Helicopteros,* will engage only in a due process analysis of personal jurisdiction.

*3 The exercise of personal jurisdiction over a nonresident defendant comports with the constitutional guarantee of due process if (1) the defendant has purposely availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the state such that (2) exercising jurisdiction will not offend "traditional notions of fair play and substantial justice." *See Beverly Hills Fan,* 21 F.3d at 1565 (quoting *International Shoe v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) and citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985)). Although Crystal bears the burden of establishing contacts by OPTi sufficient to invoke the jurisdiction of the Court, Crystal need only prove a *prima facie* case of jurisdiction because the Court is resolving OPTi's motion to dismiss without conducting an evidentiary hearing. *See Felch v. Transportes Lar-Mex SA de CV,* 92 F.3d 320, 326 (5th Cir.1996). In other words, uncontroverted allegations by the plaintiff must be taken as true, *see Beverly Hills Fan,* 21 F.3d at 1563, and any factual disputes contained in the affidavits must be resolved in the plaintiff's favor. *See Wilson v. Belin,* 20 F.3d 644, 646-647 (5th Cir.) , *cert. denied,* 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994).

The critical issue in determining whether any set of circumstances suffices to establish minimum

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

Page 4

contacts is whether the nonresident defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183. It is axiomatic, therefore, that the contacts with the forum state cannot be merely fortuitous, random, or attenuated. *See Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1268 (5th Cir.1981). The defendant's actions must justify the conclusion that he should reasonably anticipate being haled into court in the forum state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 28, 97, 100 S.Ct. 559, 567 (1980). Hence, unilateral activity of the plaintiff is insufficient to establish personal jurisdiction over the defendant. *Id.* Finally, whether the exercise of personal jurisdiction is permissible in a particular case is a fact-specific inquiry. *See Mississippi Interstate Express, Inc. v. Transpo, Inc.,* 681 F.2d 1003, 1006 (5th Cir.1982).

## A. SPECIFIC JURISDICTION

A nonresident defendant's contacts with the forum state that arise from, or are directly related to, the cause of action are sufficient to give rise to specific jurisdiction. *See Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. at 1872 n. 8 (1984). Specific jurisdiction may arise even where the nonresident defendant has never set foot in the forum state. *See Bullion,* 895 F.2d at 216. In its response to OPTi's motion to dismiss, Crystal asserts that OPTi has committed at least two acts of infringement in the Western District of Texas, either directly or through its representative in Texas, Axxis Technology Marketing, Inc. ("Axxis"), sufficient to give rise to specific jurisdiction. First, Crystal claims that Axxis forwarded demonstration boards from OPTi, which contained the allegedly infringing 82C931 product, to Dell Computer Corp. ("Dell") in Austin. Jackie Kilgore, Axxis' designated representative, stated in her deposition that demonstration boards are sent to potential customers free of charge so that they can verify the performance capabilities of a particular chip prior to purchasing the product. Crystal contends that OPTi is guilty of inducing infringement by providing the infringing devices to Dell knowing that Dell would use the product. *See* 35 U.S.C. § 271(a)-(b). Second, Crystal claims that OPTi committed al least one act of direct infringement by offering the accused product for sale in Austin. *See* 35 U.S.C. § 271(a) (offering an infringing product for sale is an act of infringement). Kilgore testified in her deposition that OPTi generated at least one price quote (which specified both price and delivery terms) for the 82C931 product, put them on OPTi letterhead, and sent them to Axxis for delivery to Dell around the "December [1996], January [1997] time frame." [FN4]

> FN4. OPTi submitted an affidavit by Gene Morales, a regional sales director for OPTi, explaining that the first time OPTi authorized any price quote of its 82C931 product to Dell was on January 30, 1997, after the filing of the plaintiff's complaint. Because Kilgore's testimony in her deposition disputes this statement, the Court is left with a credibility determination that must be resolved in favor of the plaintiff.

*\*4 The plaintiff's factual allegations regarding inducement do not suffice to establish a *prima facie* case of specific personal jurisdiction. OPTi does not dispute the inducement charge except to the extent that Crystal did not prove that Dell actually used the demonstration board in an infringing way before the filing of Crystal's complaint. The Court is not concerned with Crystal's failure to prove actual use: Crystal must make only a *prima facie* showing of personal jurisdiction, and it is reasonable to infer, given the conduct in the industry, that Dell actually used the allegedly infringing demonstration board. However, Crystal proffers absolutely no evidence to show--indeed, does not even allege--that Axxis forwarded the demonstration board to Dell before Crystal filed its complaint. *See Farmers Ins. Exchange v. The Portage La Prairie Mut. Ins. Co.,* 907 F.2d 911, 913 (9th Cir.1990) ( "Only contacts occurring prior to the event causing litigation may be considered.") Hence, the Court cannot consider Crystal's allegation of inducement for purposes of determining specific jurisdiction over OPTi.

OPTi's price quote to Dell, however, is sufficient to give rise to specific jurisdiction over OPTi. A single substantial act by the defendant, if that act gives rise to the plaintiff's claim, may be sufficient to confer personal jurisdiction. *See McGee v. Int'l Life Ins.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

Page 5

*Co.,* 355 U.S. 220, 222-24, 78 S.Ct. 199, 200-01, 2 L.Ed.2d 223 (1957); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 419 (5th Cir.1993) . It is true that the mere existence of a contract with a citizen of the forum state, standing alone, will not suffice to confer personal jurisdiction over the nonresident defendant. *See Burger King,* 471 U.S. at 478, 105 S.Ct. at 2185. Rather, the "constitutional touchstone" of a minimum contacts analysis is the concept of purposeful availment:

Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. Thus where the defendant has "deliberately" engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the "benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id.* at 475-76, 105 S.Ct. at 2183-84 (citations omitted). Similarly, "[p]urposeful availment analysis turns upon whether the defendant's contacts are attributable to his own actions or solely to the actions of the plaintiff ... [and generally] requires ... affirmative conduct by the defendant which allows or promotes the transaction of business within the forum state." *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 840 (9th Cir.1986); *see also D.J. Investments v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 545 n. 1 & 547 (5th Cir.1985) (stating that the quality of purposeful availment, rather than the number of contacts, is dispositive).

*5 In this case, the price quote for the allegedly infringing 82C931 product is a substantial, affirmative act by OPTI that is related and gives rise to Crystal's claim for patent infringement. [FN5] The majority of cases in which specific jurisdiction is founded on a single, substantial act are cases in which insurance companies contract with citizens of the forum state, or where a tort giving rise to a cause of action occurs in the forum state. *See, e.g., McGee,* 355 U.S. at 222-24, 78 S.Ct. at 200-01 (finding specific jurisdiction by virtue of a single life insurance contract with a citizen of the forum); *Brown v. Flowers Industries, Inc.,* 688 F.2d 328,

333-34 (5th Cir.1982) (approving the exercise of specific jurisdiction over a nonresident defendant who made a single defamatory telephone call to a person in that state), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 496 (1983). Although it is not entirely accurate to characterize patent infringement as a tort, *see North Am. Philips v. Am. Vending Sales, Inc.,* 35 F.3d 1576, 1579 (Fed.Cir.1994), this case is sufficiently analogous to tort cases in terms of purposeful availment analysis. By authorizing the price quote, OPTi purposefully directed its actions at Dell. and its actions were sufficiently egregious in its impact on the forum's legitimate interest in prohibiting the importation of infringing products into its territory. *See First Am. First, Inc., v. Nat'l Ass'n of Bank Women,* 802 F.2d 1511, 1516 (4th Cir.1986); *Thompson,* 755 F.2d at 1172 (finding specific jurisdiction when the defendant's sole contact with the forum state was its sale and shipment of a defective auto part); *see also North Am. Philips,* 35 F.3d at 1580 (observing that states "clearly" have an interest in preventing patent infringement). Even assuming Dell solicited the price quote. [FN6] presumably it is the regular business of OPTi to respond to such inquiries, and thus OPTi may be held liable in the various jurisdictions in which price quotes are made. *See McBreen v. Beech Aircraft Corp.,* 543 F.2d 26, 31 (7th Cir.1976).

FN5. OPTi claims that Crystals' allegations in its complaint were factually insufficient to establish a *prima facie* case of specific jurisdiction. OPTi also contends that Crystal failed to show any nexus between the price quote and the patent infringement claims in its complaint. Both arguments are without merit. Crystal alleges in its complaint that OPTi offers its products for sale in this district through Axxis. This pleading is broad enough to encompass OPTi's price quote of the 82C931 series product to Dell. In any event, the Fifth Circuit has suggested that, because of the "drastic remedy" of Rule 12(b) dismissals, plaintiffs should be allowed to amend defective complaints regarding personal jurisdiction in light of evidence produced during discovery. *See Thompson v. Chrysler Motors Corp.,* 755 F.2d 1162, 1172- 73 (5th Cir .1985).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

Page 6

FN6. There is no evidence either way as to whether Dell solicited the price quote or whether OPTi solicited Dell's business.

As a final argument, OPTi asserts that specific jurisdiction cannot lie in the Western District because the "situs of the infringing sale" was in California where OPTi is located and where it gave authorization to make the price quote. The Federal Circuit recently held as a matter of law in patent infringement cases that "the situs of the injury is the location, or locations, at which the infringing activity directly impacts on the interests of the patentee," *i.e.*, the place of the infringing sales. *Beverly Hills Fan*, 21 F.3d at 1571. The Federal Circuit recognized, however, that, unlike the making and using an infringing article, the situs of the sale of an infringing product can, in certain instances, be defined in many different ways--it can include the location of the seller or buyer, points along the shipment route, or in "formal terms" as the point at which legal title passes. *See North Am. Philips v. Am. Vending Sales, Inc.,* 35 F.3d 1576, 1579 (Fed.Cir.1994). Accordingly, the Federal Circuit declined, as OPTi would have the Court do, to put form above substance, and instead held that "to sell an infringing article to a buyer in [a particular state] is to commit a tort there (though not necessarily only there)." *See id.* Likewise, in non-patent infringement cases, where the injury is felt is germane to the inquiry. *See Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763 (5th Cir.1988) (noting in upholding personal jurisdiction that the defendant knew where the brunt of any injury arising out of its actions would be felt) (citing *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)). In this case, although the price quote originated in California, Dell, the potential buyer, and Crystal, the patent- holder, are both located in Austin. In sum, OPTi's single contact with the Western District was of such a nature that OPTi should have reasonably anticipated being haled into court here, thus reaching the minimum level acceptable for due process.

**B. GENERAL JURISDICTION**

*6 If the defendant's contacts with the forum state are not directly related to the plaintiff's cause of action, they will still suffice to establish general jurisdiction if they are sufficiently continuous and

systematic to support a reasonable exercise of jurisdiction. *See Helicopteros,* 466 U.S. at 415-16, 104 S.Ct. at 1872-73; *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 779-80, 104 S.Ct. 1473, 1481, 79 L.Ed.2d 790 (1984); *see also Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777-79 (5th Cir.1986) (explaining that courts are required to examine a nonresident defendant's contacts " *in toto* to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process"), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1892, 95 L.Ed.2d 499 (1987).

OPTi maintains no place of business, employees, registered agents, telephone listings, or bank accounts in the Western District and, as such, cannot be said to be "doing business" in the traditional sense. *See Bearry,* 818 F.2d at 376. The Court is nevertheless confident that the exercise of general jurisdiction over OPTi is consistent with due process. Crystal makes the following allegations in its original complaint:

OPTi has a place of business in Houston, Texas which does business in this judicial district by ... offering for sale and selling OPTi products in this district. Further, OPTi does business in this judicial district by and through a sales representative located in Austin, Texas offering for sale and selling OPTi's products in this judicial district as OPTi's agent and representative.

Furthermore, it is undisputed that several OPTi employees have made numerous trips to the Western District to visit customers and potential customers regarding noninfringing products. Specifically, John Riley, a product marketing manager based in OPTi's California and, starting in April 1995, Houston offices, made eleven (11) business trips to the Western District between October 1995 and April 1996. Greg Hartman, an OPTi field applications engineer based in Houston, made twenty (20) trips to the Western District between September 1995 and September 1996. Several California-based regional sales directors also made trips to the Western District to pursue business opportunities here: Gene Morales made four (4) trips to Austin between October 1995 and February 1997, while Dan Carlson made seventeen (17) visits to Austin between January 1995 and October 1996. Finally, Crystal contends that OPTi has established a "permanent presence" in the Western District through Axxis, that OPTi has

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

Page 7

contracted with Axxis to sell the infringing product to businesses in the Western District, and that OPTi has paid Axxis commissions on over $30 million in sales in 1996.

Citing *Bearry,* OPTi relies heavily on the proposition that it has structured its business transactions in the Western District to avoid the benefits and protections of the laws of Texas. *See id.* at 376. Specifically, OPTi contends that it (1) contracts with an independent sales agent (Axxis) to solicit orders for its products in Texas; (2) completes its shipment of products outside of the Western District (*i.e.,* F.O.B. Milpitas); and (3) accepts all offers for sale outside of the Western District (*i.e.,* California). *Beary* makes it clear that in general jurisdiction cases, as opposed to specific jurisdiction cases, the way in which a business structures its transactions, including the "technicalities" of when title to goods passes, is apropos to an analysis of purposeful availment. *See id.* at 376. Likewise, OPTi's use of an independent sale agent in Austin does not, in and of itself, create minimum contacts sufficient to warrant general jurisdiction. OPTi only asserts, however, that none of Axxis' $30 million in sales were to customers in the Western District. Significantly, OPTi does not dispute Crystal's original allegation that Axxis made offers to sell OPTi products in the Western District and that OPTi's Houston office sells and makes offers to sell OPTi products in the Western District. [FN7] Additionally, Kilgore testified in her deposition that Axxis merely forwarded the price quote of the allegedly infringing 82C931 product to Dell. This evidence is sufficient to raise an inference that either (1) OPTi has some control over the solicitations made by Axxis to customers, [FN8] or (2) OPTi makes directs offers to sell to customers in the Western District. *See id.* at 376 (implying that whether a nonresident defendant has control over its independent retailers is relevant to an analysis of general jurisdiction). Direct sales to the forum state presents a different situation than the simple "stream of commerce" scenario presented in *World-Wide Volkswagen.* Moreover, Crystal need not proffer evidence of the volume and number of shipments to establish a *prima facie* case of general jurisdiction. *See Felch,* 92 F.3d at 328 n. 18 (5th Cir.1996) (citing *DeMelo v. Toche Marine, Inc.,* 711 F.2d 1260 (5th Cir.1983)).

FN7. OPTi merely states that the permanent employee in the Houston office, a field applications engineer, does not have the authority to bind OPTi in contracts. In view of Crystal's unambiguous allegations, the Court is not concerned that it is making a hyper-sensitive semantical distinction. If OPTi does not sell or offer to sell its products in the Western District, it should have said so, simply and clearly. *See Beverly Hills Fan,* 21 F.3d at 1563 (explaining that the defendant must "directly" controvert the plaintiff's allegations, and denials that are either "inartfully phrased or craftily written" to avoid a direct refutation will not suffice). In fact, OPTi admits that it may have sold insubstantial quantities of the 82C931 to a customer "in the state of Texas."

FN8. OPTi claims it has no control over the way Axxis conducts its business, and, in support, OPTi attached a copy of its Sales Representative Agreement with Axxis to its reply. The contract states that Axxis "agrees to conduct all of its business in its own name and in such manner as it may see it." OPTi failed, however, to point the Court to another provision in the contract which states that Axxis "agrees to assist OPTi personnel when requested in making sales calls in the Territory." This provision, along with Kilgore's deposition testimony, is sufficient to raise an inference that OPTi maintains some control over Axxis' sales efforts.

*7 Like the defendant in *Holt Oil,* OPTi has maintained "constant and extensive" business connections with the Western District, and the instant controversy arises out of OPTi's general business contacts with the Western District. *See id.* at 779. Four (4) OPTi employees have made a total of fifty-two (52) trips to the Western District within a recent two-year span-- approximately one trip every two weeks--presumably either to service or to enlist customers in the Western District. As the Fifth Circuit indicated in *Holt Oil,* such contacts "differ both qualitatively and quantitatively from the sort of 'random,' 'fortuitous,' or 'attenuated' contacts

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

Page 8

which will not support an exercise of *in personam* jurisdiction." *Id.* Finally, the fact that OPTi has chosen to maintain a permanent employee in Houston to serve its Texas customers, while is not directly relevant to our inquiry, confirms the continuous and systematic nature of OPTi's contacts with Texas residents, many of whom reside in the Western District. In short, OPTi's protestations that its contacts with the Western District are "lean and occasional" to the contrary, Crystal has demonstrated sufficient minimum contacts to support general jurisdiction.

Even if minimum contacts are established, personal jurisdiction over a nonresident defendant is not warranted if its exercise "offends traditional notions of fair play and substantial justice." *See International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158. As *Beverly Hills Fan* observed, "[i]n general these cases are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Id.* at 1568. The Court must take the following factors into consideration: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in securing relief; (4) the interest of the judicial system in the efficient resolution of controversies; and (5) the states' shared interest in furthering fundamental social policies. *Wilson,* 20 F.3d at 647 n. 3.

Taking all of these considerations into account, the Court concludes that exercising personal jurisdiction over OPTi would not offend traditional notions of fair play and substantial justice. Crystal's offices are located in Austin, and all of the inventors of the patents-in-suit reside in here. The Western District has a keen interest in assuring that infringing products do not enter its territory. Given the frequent business trips its employees make to the Western District, OPTi will not be unduly burdened in traveling here to defend itself. Nor has OPTi made any specific showing that significantly more witnesses reside in California than in Austin. Like the plaintiff in *Beverly Hills Fan,* Crystal will be able to seek redress in the Western District for sales of the accused product to consumers in other states; thus other states will be "spared the burden of providing a forum" for Crystal. *See id.* at 1568. Finally, the Western District has a substantial

interest in cooperating with other states to provide a forum for efficiently litigating the plaintiff's cause of action: the several states share an interest in fostering invention and creation, an interest that would be hampered in this instance if Crystal's claims prove true and it were forced to bring suit far from home. Fair play and substantial justice are not offended by maintenance of this lawsuit against OPTi in the Western District.

## II. CONVENIENCE TRANSFER

**\*8** In the alternative, OPTi and both TriTech defendants request that this case be transferred to the Northern District of California, where all three defendants concede jurisdiction and venue are proper. Pursuant to 28 U.S.C. § 1404(a), this Court has discretionary power to transfer a case "for the convenience of the parties and witnesses, in the interest of justice," to any district where it might have been brought. In support of their motion to transfer, the TriTech defendants identified four witnesses they expect to call at trial. Only one of those witnesses, Keith Jackson, president of both TriTech, Inc. and TriTech Pte, resides in Singapore; the remaining witnesses reside in California. OPTi fails to identify any witnesses who would be inconvenienced by maintaining the suit in Austin. On the other hand, all three inventors of the patents-in-suit, two of whom no longer work for Crystal, reside in Austin. Therefore, the balance of convenience to TriTech Inc., OPTi, and Crystal is likely to prove a wash--there are experts, fact witnesses, and documents in both locations. Short of splitting the difference in, say, Arizona, there is no way to convenience both parties at once. In addition, the extra burden on TriTech Pte to defend in Austin, as opposed to California, is minimal. A measly three-hour plane ride from San Jose to Austin is not, in the words of TriTech Pte, an "extraordinary burden and inconvenience" considering the fact that its witnesses would, in any event, have to travel half-way around the world to defend the lawsuit in California.

Finally, the facts found by the Court to support venue in the Western District against OPTi under § 1406--a point both TriTech defendants belatedly conceded for themselves--would also support venue under § 1404. A plaintiff is generally entitled to choose his forum, and the Court sees no countervailing reasons to deny Crystal that choice.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
44 U.S.P.Q.2d 1497
(Cite as: 1997 WL 798357 (W.D.Tex.))

[FN9] Maintaining venue in the Western District is neither vexatious nor oppressive upon any of the defendants; accordingly, their motions to transfer pursuant to § 1404 are denied.

> FN9. For this reason, the fact that Crystal's parent company, Cirrus Logic, is located in California is immaterial. Crystal remains the holder of the patents-in-suit.

For the foregoing reasons, the Court enters the following orders:

IT IS ORDERED that the Motions filed by TriTech, Inc. and TriTech Pte to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406 for improper venue [# 12-1 and # 13-1, respectively], having been voluntarily withdrawn, are DISMISSED AS MOOT;

IT IS FURTHER ORDERED that the Motions filed by TriTech Inc. and TriTech Pte to Transfer pursuant to 28 U.S.C. § 1404(a) [# 12-2 and # 13-2, respectively] are DENIED; and

IT IS FINALLY ORDERED that OPTi's Motion to Dismiss or Transfer pursuant to 28 U.S.C. §§ 1406 and 1404(a) [# 17] is DENIED.

1997 WL 798357 (W.D.Tex.), 44 U.S.P.Q.2d 1497

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works